FILED

2016 Jan-08  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 2:13-cv-01835-SCG |
| CAROLYN DENMARK, et al., | ) ) ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff State Farm Fire and Casualty Company ("State Farm") asks this court to declare it has no duty to defend or indemnify Defendants Betty Carol Wren, individually, Betty Carol Wren, d/b/a Loletah's Salon, or Loletah's Salon, Inc. (collectively, the "Wren Defendants") for claims asserted against them by Defendant Carolyn Denmark ("Denmark") in an underlying state court action. (Doc. 1).[1] State Farm moved for summary judgment pursuant to Federal Rule of

---

[1] State Farm also asked this court to declare it had no duty to defend or indemnify the Wren Defendants for claims asserted against them by Defendant Carolyn Denmark, as personal representative of the Estate of Donald Norman Denmark, Jr., in an underlying wrongful death action in Alabama state court. (Doc. 1). State Farm moved for summary judgment on that claim. (Doc. 29). After the filing of State Farm's motion for summary judgment, the underlying wrongful death action settled and was dismissed. (Doc. 44). As a result, State Farm's pending motion for summary judgment is due to be denied as moot as to the underlying wrongful death action. The undersigned, therefore, addresses only State Farm's motion for summary judgment as to Mrs. Denmark's underlying personal injury action in this Report and Recommendation. However, the same analysis that applies to State Farm's duty to defend and indemnify the Wren Defendants for Denmark's pending personal injury action would have applied to State Farm's duties with respect to the dismissed wrongful death action.

Civil Procedure 56 (Doc. 29), and Denmark filed a motion to compel discovery responses from State Farm (Doc. 36).  The motions are fully briefed and ripe for review (Docs. 38, 39, 41, 42).   After a careful review of the record and for the reasons stated below, the undersigned concludes State Farm's motion for summary judgment is due to be granted as to Mrs. Denmark's personal injury action and Denmark's motion to compel is due to be denied as moot.

## I.  <u>STANDARD OF REVIEW</u>

Under Rule 56(a) of the *Federal Rules of Civil Procedure*, summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment always bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, then the non-moving party must "go beyond the pleadings" and point to specific facts in the record to show there is a genuine issue for trial.  *Id.* at 324 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (per curium) (quoting *Anderson*, 477 U.S. at 249). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted).

## II. <u>FACTUAL BACKGROUND</u>

To the extent any factual inferences are drawn, they are drawn in favor of Denmark, the non-movant.[2]

---

[2] In her response to State Farm's motion for summary judgment (Doc. 29), Denmark did not directly respond to State Farm's statement of undisputed facts as required by the initial order (Doc. 6). Instead, Denmark included a summary of disputed material facts in her response.

A. <u>**The Accident and Underlying Suits**</u>

This action arises from a tragic car accident resulting in the death of Carolyn Denmark's husband, Donald Norman Denmark, Jr., and causing severe injuries to Mrs. Denmark, which rendered her a quadriplegic.  (Doc. 41-1, at 5 (18:13-19:3); Doc. 41-2, at 6 (23:11-18); *see also* Doc. 29-1 at 15).[3]  The accident occurred on February 27, 2012, when Betty Carol Wren ("Wren") attempted to turn onto Highway 157 in Cullman County, Alabama and struck the vehicle in which the Denmarks were travelling.  (Doc. 29-1 at 15, 150 (46:5-10)).

Denmark filed a personal injury action against Wren and Allstate Insurance Company in the Circuit Court of Cullman County, Alabama on April 19, 2012, asserting negligence and wantonness claims against Wren and an underinsured motorist claim against Allstate.  (Doc. 29-1 at 15).  Denmark amended her complaint on January 4, 2013, to add claims against Betty Carol Wren d/b/a Loletah's Salon and Loletah's Salon, Inc. (*Id*. at 18-20).  Specifically, Denmark added the following allegations:

> 11.  On or about February 27, 2012, defendant Betty Carol Wren was operating a business vehicle of Loletah's Salon at the time of the automobile collision and as an agent of Loletah's Salon.

---

(Doc. 41 at ¶¶ 1-33).  Because several of the facts in Denmark's summary of disputed facts dispute facts State Farm included in its statement of facts, the undersigned will not deem the facts in State Farm's statement to be admitted.

[3]  All citations to the record refer to document and page numbers as assigned by the court's electronic filing system, except for citations to depositions, which also include a parenthetical with the deposition page number(s) and line number(s).

12.     As a proximate result of the defendant's negligence and/or wantonness, committed as an agent of Loletah's Salon, [Mrs. Denmark] suffered severe personal injuries and damages.

[…]

14.     On February 27, 2012, defendant Betty Carol Wren was operating a business vehicle, classified for business use with Loletah's Salon, Inc. at the time of this automobile collision.

15.     As a proximate result of the defendant's negligence and/or wantonness committed while driving a business vehicle of Loletah's Salon, Inc., [Mrs. Denmark] suffered severe personal injuries and damages.

(*Id.* at 19-20).

### B. The State Farm Insurance Policy Issued to Loletah's Salon, Inc.

At the time of the accident, State Farm insured the Wren Defendants under a business liability policy issued to Loletah's Salon, Inc., with coverage limits of $300,000 per occurrence.[4]  (Doc. 41-3 at 3 (11:12-19); Doc. 29-1 at 30; Doc. 41-7 at 96).  Under the policy, State Farm agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury … to which this insurance applies."  (Doc. 29-1 at 53; Doc. 41-7 at 35).

The named insured under the policy is Loletah's Salon, Inc., a business incorporated on February 10, 2004 with Wren as its president and director.  (Doc. 29-1 at 30; Doc. 41-3 at 9 (34:7-21); Doc. 41-7 at 96).  Loletah's Salon, Inc.,

---

[4] As discussed in Section III(A), *infra*, the parties dispute which specific State Farm policy was in force at the time of the accident.

dissolved in or before January 2008, though Wren continued to operate the business as a sole proprietorship under the name Loletah's VIP Salon (the "Salon").  (Doc. 41-3 at 10 (38:4-6; 38:14-39:6)).  The Salon is a cosmetology business that also sells hair and beauty products, jewelry, antiques, and clothing. (*Id.* at 5 (18:18-19:5)).  The Salon was a sole proprietorship at the time of the accident, with Wren as its sole owner.  (*Id.* at 11 (41:11-42:5)).

Wren did not notify State Farm when Loletah's Salon, Inc., dissolved.  (*Id.* at 10 (38:7-13)).  Accordingly, the State Farm Business Liability Policy in force at the time of the accident identified Loletah's Salon, Inc., as the named insured even though the corporation was no longer a viable entity.  (*See* Doc. 29-1 at 30; Doc. 41-7 at 96).  If State Farm had been notified that Loletah's Salon, Inc., had been dissolved and the Salon was operated as a sole proprietorship, the named insured in the policy would be Betty Carol Wren or Betty Carol Wren d/b/a/ Loletah's VIP Salon.  (Doc. 41-8 at 10 (39:11-40:9)).[5]

### C. Wren's Vehicle and Activities On the Day of the Accident

Wren was driving a 2001 Lexus RX 3000 (the "Lexus") at the time of the accident.  (Doc. 29-1 at 145 (27:1-6)).  Wren drove the Lexus as her "full-time vehicle," and she used the Lexus both for personal purposes and to perform errands for the Salon.  (Doc. 29-1 at 145, 148 (28:12-14; 40:11-14); Doc. 41-3 at 11

---

[5] State Farm is not denying coverage on the grounds that the incorrect entity is named as the insured under the policy.  (Doc. 41-8 at 19-20 (74:12-77:2)).

(42:14-43:14)).  Wren did not own the Lexus; it was owned by her husband.  (Doc. 41-3 at 3-4 (12:18-13:6)).  Wren had her husband's permission to use the Lexus, and he knew Wren used the Lexus for the Salon.  (*Id*. at 11-12 (44:11-45:5)).  There was no written agreement between Wren and her husband about her use of the Lexus, and Wren did not pay her husband for her use of the vehicle.  (*Id.* at 11 (44:8-19)).  Wren and her husband claimed all of the Lexus's mileage from 2012 as business miles on their 2012 taxes.  (Doc. 29-1 at 148 (39:1-14); Doc. 41-4 at 7-8 (28:18-29:9)).

On the morning of the accident, Wren drove the Lexus to the Salon to take photos for the Salon's website.[6]  (Doc. 41-3 at 4 (15:3-15)).  After finishing the photo shoot at the Salon, Wren drove home to change clothes, and she was at her home just before the accident.  (Doc. 29-1 at 149 (43:4-6); Doc. 41-3 at 12 (47:15-48:6)).  Wren left her home and was on her way to Hartselle, Alabama, to meet her sisters for her birthday lunch at the time of the accident.  (Doc. 29-1 at 147, 149 (33:12-20; 43:7-12)).  After her birthday lunch, Wren had planned to go shopping for the Salon in Decatur or Huntsville.  (Doc. 41-3 at 5-6 (18:13-19:20; 21:8-16)).  Wren and her sisters chose Hartselle as a meeting place in part because it was on the way from Wren's house to Decatur and Huntsville where she planned to shop for the Salon.  (*Id*. at 5 (19:21-20:9)).

---

[6] The accident occurred on a Monday, a day when the Salon was generally closed.  (Doc. 29-1 at 146-47 (32:18-33:11); Doc. 41-3 at 3 (11:10-11)).

Additionally, on the day of the accident, Wren was carrying her business tax records in the Lexus "because [she] would periodically work on [her] taxes when [she] had a free minute during the day." (*Id*. at 4 (16:10-23)). Wren also attested in part as follows:

> "Being in a small town and doing what I do, my appearance is very important to me. The clothes I wear, the way I style my hair and the car I drive are all very important to my image. I want people to want me to help them look their best so I try to look my best to promote that image. Therefore, I am literally always on the job advertising for my business."

(*Id.* at p. 4 (14:3-15)).

## III. ANALYSIS

The issue before this court is whether State Farm owes a duty to defend and indemnify the Wren Defendants for Denmark's claims against them in the underlying state court action. State Farm argues the Wren Defendants are not insureds as defined by the policy in force at the time of the accident and, therefore, it has no such duty. State Farm also argues that, even if the Wren Defendants qualified as insureds under the policy, the policy's automobile exclusion precludes coverage for Denmark's claims. Finally, State Farm argues there is no coverage for the underlying action because the Wren Defendants violated conditions in the policy requiring prompt notice of potential claims.

After careful review of the Rule 56 record, as discussed below, the undersigned concludes State Farm has no duty to defend and indemnify the Wren

Defendants in the underlying state court action because the policy's auto exclusion precludes coverage for the claims asserted against them.   Because there is no coverage under the State Farm policy for Denmark's claims against the Wren Defendants, the undersigned does not address State Farm's argument Wren violated policy conditions by failing to provide the insurer with prompt notice of the accident.   Moreover, because the Rule 56 record establishes there is no coverage under the State Farm policy and the documents sought by Denmark in her motion to compel are not relevant to that issue, Denmark's motion to compel is due to be denied as moot.

### A.   <u>The State Farm Policy in Force at Time of the Accident</u>

To analyze whether State Farm has a duty to defend and indemnify, the undersigned must look to the terms of the applicable insurance policy.   The parties dispute which State Farm policy was in force at the time of the accident.   State Farm submitted a certified copy of Policy Number 93-BD-M247-7, issued to Loletah's Salon, Inc. (the "Certified Policy"), with its motion for summary judgment, and a custodian of records for State Farm certified it was the policy in effect on the date of the accident.   (Doc. 29-1 at 29-97).   Indeed, the renewal certificate for the Certified Policy supports that assertion and indicates the Certified Policy was in effect from May 4, 2011, to May 4, 2012.   (*Id*. at 30).   The renewal certificate also identifies the policy form as FP-6103 and the amount of

coverage as $300,000 per occurrence.  (*Id*.).

On the other hand, Denmark contends the "only contract delivered to Betty Wren by State Farm is Exhibit 7" to Denmark's Opposition.  (*Id*.).  That exhibit, however, is not a single contract or policy.  Rather, it is an affidavit from Wren attaching three exhibits relating to different State Farm policies.  (Doc. 41-7 at 1). In her affidavit Wren attests:

> "[Her] customary practice is to keep all of [her] insurance policies in a file.  I have searched that file and I found three State Farm policies.  I am attaching all three of those insurance[] policies to this affidavit as Exhibit A, B and C.  [] I received these insurance policies in the United States Mail.  [] To my knowledge, these are the only insurance policies that I received in the mail from State Farm."

(*Id*.).  Two of the exhibits attached to Wren's affidavit had effective dates either before or after the accident, so they are clearly not the policy in force on the date of the accident.  First, Exhibit A is a renewal certificate for Business Policy Number 93-GO-4216-6 identifying the policy form as FP-6103 and listing the policy's effective dates from October 25, 2006, to October 25, 2007.  (*Id*. at.4).  Next, Exhibit C is Business Policy Number 93-BD-M247-7 with a declarations page identifying the policy form as CMP-4100 and listing the policy's effective were dates as May 4, 2012, to May 4, 2013. (*Id*. at 96, 100).  Since neither of the policies referenced in Exhibits A and C was in effect on February 27, 2012, neither is the policy that was in force at the time of the accident.

Exhibit B to Wren's affidavit is the insurance policy Denmark relies upon to

support her arguments for coverage.  (*See* Doc. 41 at 4-7, 11).  Exhibit B is an undated insurance policy form CMP-4100, and it does not contain any declaration pages, endorsements, or a renewal certificate.  Moreover, Exhibit B gives no indication of the effective dates of the policy or the amount of coverage provided by the policy.  Accordingly, the form attached as Exhibit B to Wren's affidavit is not a complete policy and provides no evidence regarding which State Farm policy was in force at the time of the accident.

The undersigned finds Wren's affidavit and the exhibits attached to it are not sufficient evidence to create a genuine issue of fact regarding which State Farm policy was in force on the date of the accident.  Instead, based on the Rule 56 record, the Certified Policy was the policy in force at the time of the accident.  Moreover, as discussed below, the undersigned concludes that State Farm has no duty to defend and indemnify the Wren Defendants for the underlying suit under the terms of either the Certified Policy or the undated policy form Denmark relies upon in her opposition to State Farm's motion for summary judgment.

**B.**     **Alabama Law Regarding the Duty to Defend or Indemnify**

Liability insurance policies, such as the business liability policy at issue in this action, impose two separate duties on the insurer:  the duty to defend and the duty to indemnify.  *Tanner v. State Farm Fire & Cas. Co.*, 874 So.2d 1058, 1063

(Ala. 2003) (citation omitted).[7]   The duty to defend is broader than the duty to indemnify.   *Id.*   Thus, where there is no duty to defend, there is no duty to indemnify.   *Id.*   As a result, the undersigned begins by analyzing whether State Farm owes a duty to defend the Wren Defendants in the underlying suit.

 "Under Alabama law, whether an insurance company owes its insured a duty to provide a defense is determined primarily by the allegations contained in the complaint."   *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 894-95 (citing *United States Fid. & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1168 (Ala.1985)).   If the allegations in the complaint do not establish a duty to defend, a court may then look to admissible evidence to determine if an insurer owes a duty to defend under the policy.   *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1009-10 (Ala. 2005).

Courts generally employ a three-step inquiry to determine whether a claim is covered by an insurance policy.   *See USF Ins. Co. v. Metcalf Realty Co.*, No. 12-2529, 2013 WL 4679833, *5 (N.D. Ala. Aug. 20, 2013) (citations omitted).   First, the party seeking coverage under the policy bears the burden of establishing the

---

[7] As a federal court sitting in diversity, the court must apply the choice of law principles of Alabama, the forum state.   *St. Paul Fire and Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 895 n.1 (11th Cir. 2009) (citation omitted).   Absent a provision in a contract specifying which law governs, Alabama applies the law of the state where the contract was formed to contract disputes.   *See Id.*; *Cherokee Ins. Co. v. Sanches*, 975 So.2d 287, 292 (Ala. 2007).   For insurance policies, the state in which the policy was issued and delivered is the state where the contract was formed.   *Cherokee Ins. Co.*, 975 So.2d at 293 (citation omitted).   Because this matter involves the interpretation of an insurance policy issued and delivered in Alabama, Alabama substantive law applies.   (*See* Doc. 29-1 at 30).

claim is covered by the policy's initial grant of coverage. *Jordan v. Nat'l Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11th Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage.") (citation omitted); *USF Ins. Co.*, 2013 WL 4679833 at *5. Next, the insurer has the burden of establishing an exclusion in the policy precludes coverage for the claim. *Id.*; *Jordan*, 922 F.2d at 735. Then, if a policy exclusion potentially precludes coverage for a claim, the burden shifts back to the party seeking coverage to establish an exception to the exclusion applies. *USF Ins. Co.*, 2013 WL 4679833 at *5.

In determining if coverage is provided by a policy, insurance policies should be construed "to give effect to the intention of the parties." *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 691 (Ala. 2001) (quoting *Attorneys Ins. Mut. Of Ala., Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So.2d 866, 870 (Ala. 1996)). Additionally, "it is well established 'that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured.'" *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 898 (11th Cir. 2009) (quoting *St. Paul Mercury Ins. Co. v. Chilton–Shelby Mental Health Ctr.,* 595 So.2d 1375, 1377 (Ala.1992)). "It is equally well settled, however, that insurers have the right to limit their liability by writing policies with narrow coverage." *Id.* (citing *Johnson v. Allstate Ins. Co.,* 505 So.2d 362, 365

(Ala.1987)). Accordingly, if there is no ambiguity in the terms of an insurance policy, a court must enforce the policy "as written and cannot defeat express provisions in a policy by making a new contract for the parties." *St. Paul Fire and Marine Ins. Co.*, 572 F.3d at 898 (citing *Johnson v. Allstate Ins. Co.*, 505 So.2d 362, 365 (Ala. 1987)).

"While ambiguities or uncertainties in an insurance policy should be resolved against the insurer, ambiguities are not to be inserted by strained or twisted reasoning." *Twin City Fire Ins. Co.* 817 So.2d at 692 (citation omitted). Moreover, just because a term is undefined in the policy does not mean the policy is ambiguous; rather, "the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it." *Id.* (citation omitted). Finally, in analyzing the terms of an insurance policy, "a court must examine more than the isolated sentence or term; it must read each phrase in the context of all other provisions." *Id.* at 691 (citation omitted).

### C. <u>Who is an Insured Under the State Farm Policy</u>

Denmark asserts Wren is an insured under the terms of the policy because she was driving a non-owned auto and was on the job at the time of the accident. (*See* Doc. 41 at 13). On the other hand, State Farm argues there is no coverage for the underlying suit because Wren is not an insured under the terms of the Certified Policy with respect to the accident. (Doc. 29 at 11-22). The Certified Policy

includes different definitions of "who is an insured" under the policy, and the two relevant definitions will be analyzed separately.

    1.    <u>Is the Lexus a Non-Owned Auto Under the Terms of the Policy?</u>

First, the Certified Policy includes a specific definition of "who is an insured" for claims arising out of the use of a non-owned auto. Specifically, the Certified Policy provides in pertinent part as follows:

> "With respect to bodily injury or property damage arising out of the … use … of any non-owned auto … an executive officer of yours … is an insured, but only while such 'non-owned auto' is being used in your business.
>
> However, any executive officer … is not an insured for any auto owned or leased by such officer … or a member of his or her household."

(Doc. 29-1 at 83). Wren was an executive officer of Loletah's Salon, Inc. (Doc. 41-3 at 9 (34:7-21)). Therefore, Wren could potentially be an insured under this definition if the Lexus is a non-owned auto and was being used for the business at the time of the accident.

A non-owned auto is defined in the Certified Policy as "any auto you do not own, lease, hire or borrow which is used in connection with your business."[8] (Doc. 29-1 at 65). Neither the Salon nor Wren owned the Lexus she was driving at the

---

[8] The term "you" is defined in turn as "the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy." (Doc. 29-1 at 34; Doc. 41-7 at 58).

time of the accident; it was owned by Wren's husband.  (Doc. 41-3 at 3-4 (12:18-13:6)).  Wren did not pay anything to her husband for the use of the Lexus, and there was no written agreement between the Wrens regarding her use of the vehicle.  (*Id.*, at 11 (44:8-19)).  Therefore, State Farm rightly concedes the Wren Defendants did not own, lease, or hire the Lexus.  (*See* Doc. 29 at 21, n. 20).  Thus, the question of whether the Lexus is a non-owned auto turns only on whether the Wren Defendants borrowed the Lexus.

"Borrow" is not defined by the Certified Policy; therefore, it is given the definition a person of ordinary intelligence would give it.  *Twin City Fire Ins. Co.*, 817 So.2d at 692.  Black's Law Dictionary defines "borrow" as "to take something for temporary use."  BLACK'S LAW DICTIONARY 221 (10th ed. 2014).  Although a person must generally have an owner's permission to borrow an item, neither a written agreement nor an exchange of money is required to borrow the item.  Instead, borrowing usually does not involve any written agreement or remuneration.  *See State Farm Fire and Cas. Co. v. ARC Mfg, Inc.*, 11 F. Supp. 3d 898, 905 (D. Minn. 2014); *Metzger*, *v. Country Mut. Ins. Co.*, 986 N.E.2d 756, 764 (Ill. App. 2013) (borrowing "does not require that the lending arrangement be formalized").  In addition, the "'frequency of use is not determinative—or even pertinent' in determining whether [an item] has been 'borrowed.'"  *Metzger*, 986 N.E.2d at 764 (quoting *Gold v. Casserly Landscape, Inc.*, 812 P.2d 33, 34 (Or.

App. 1991)).  Instead, "temporary" as used in the definition of borrow "merely describes a lack of permanence" and, with respect to the borrowing of a vehicle, simply means title to the vehicle does not transfer to the borrower.  *See ARC Mfg., Inc.*, 11 F. Supp. 3d at 906.

Wren used the Lexus with her husband's permission, and he knew she used the vehicle for the Salon.  (Doc. 41-3 at 11-12 (44:11-45:5)).  Although Wren used the Lexus as her full-time vehicle, her husband retained title to the Lexus, and there was no permanent transfer of ownership of the Lexus to either Wren or the Salon.  Based on this evidence, the only reasonable conclusion a jury could reach is that the Wren Defendants borrowed the Lexus from Wren's husband.  Thus, the Lexus is not a non-owned auto, and the Certified Policy's definition of "who is an insured" with respect to liability arising from the use of non-owned autos does not apply to Denmark's claims against the Wren Defendants.  Moreover, even if the Lexus qualified as a non-owned auto, Wren would not be an insured under the definition quoted above because the Lexus was owned by a member of her household.[9]  (*See* Doc. 41-3 at 11-12 (42:14-18; 45:10-14)).

---

[9] The undated policy form Denmark asserts was in force at the time of the accident also includes a specific definition of "who is an insured" under the policy "with respect to liability arising out of the use of 'non-owned autos.'"  (Doc. 41-7 at 44).  The undated policy form defines non-owned auto as:

> "any auto you do not own, lease, hire, rent or borrow which is used in connection with your business.  This includes 'autos' owned by or registered to your … 'executive officers' … or members of their households, but only while used in

17

    2.  <u>Was Wren Acting With Respect to the Conduct of the Business at the Time of the Accident?</u>

Except with respect to liability arising from the use of a non-owned auto, the

Certified Policy defines an insured in pertinent part as follows:

    "If you are designated in the Declarations as:

    (a) an individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner;

    […]

    (d)    an organization other than a partnership, joint venture or limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers and directors."

(Doc. 29-1 at 82).

    Loletah's Salon, Inc., is designated in the declarations as the named insured

---

    your business or your personal affairs."

(*Id.* at 48).   As discussed above, the Wren Defendants borrowed the Lexus from Wren's husband.  Therefore, the Lexus is not a non-owned auto as defined by the undated policy form Denmark relies upon in her opposition to State Farm's motion for summary judgment. Accordingly, just as with the Certified Policy, the undated policy form's definition of who is an insured with respect to liability arising from the use of a non-owned auto does not apply to the claims asserted against the Wren Defendants.  In addition, even if the Lexus was a non-owned auto as defined by the undated policy form, Wren would not be an insured under the form's definition of an insured with respect to liability arising out of the use of a non-owned auto because the Lexus was owned by a member of her household.   (*See id.* at 44 ("None of the following is an insured: … Any … 'executive officer' for any 'auto' owned by or registered to such … officer or a member of his or her household."); Doc. 41-3 at 11-12 (42:14-18; 45:10-14)).

in the Certified Policy.[10]  (Doc. 29-1 at 30).  Based on that designation, Wren, who was the president and director of Loletah's Salon, Inc., is an insured under the Policy, but only with respect to her duties as an officer and director.  (*See* Doc. 41-3 at 9 (34:7-21)).  Wren's duties as an officer and director of Loletah's Salon, Inc., are not specifically identified in the Rule 56 record, nor are they defined in the Certified Policy.  Construing the policy language in favor of coverage and the evidence in the light most favorable to Denmark, it is reasonable to infer Wren's duties as an officer and director of Loletah's Salon, Inc., overlap completely with the conduct of the business of the Salon.

If the policy declarations correctly reflected the structure of the business at the time of the accident, then Betty Carol Wren d/b/a Loletah's VIP Salon would have been designated as the named insured.  (Doc. 41-3 at 10-11 (38:4-6; 38:14-39:6; 41:11-42:5); Doc. 41-8 at 10 (39:11-40:9)).  Based on this designation, Wren would be an insured, but only with respect to the conduct of the business of the Salon.  Thus, whether the State Farm policy designated Loletah's Salon, Inc., or Betty Carol Wren d/b/a Loletah's VIP Salon as the named insured, Wren must have been acting with respect to the conduct of the business at the time of the

---

[10] The Certified Policy provides that "Declarations include the policy Declarations … [and] the most recent renewal notice or certificate . . . ."  (Doc. 29-1 at 34).

accident to be an insured under the terms of the Certified Policy.[11]

Because it is not defined in the policy, the phrase "conduct of a business" is interpreted "according to the meaning a person of ordinary intelligence would reasonably give it." *Safeway Ins. Co. of Alabama v. Herrera*, 912 So.2d 1140, 1143 (Ala. 2005). As used in the Certified Policy, the phrase "conduct of a business" differentiates between a business owner's personal and business activities. *See State Farm Fire & Cas. Co. v. Leblanc*, No. 09-76, 2013 WL 2149750, at *9 (M.D. Ga. May 16, 2013) ("The phrase 'conduct of business' requires a focus on the purported insured's activity in determining whether the conduct of the business owner was business or personal.") (quoting *Nova Cas. Co. v. Anderson*, No. 804-2085, 2005 WL 3336496, at *4 (M.D. Fla. Dec. 8, 2005)); *Society Ins. v. Linehan*, 616 N.W.2d 918, 921 (Wis. App. 2000) (interpreting the phrase "conduct of a business" and noting that "conduct is either personal or business."). To determine if an insured's activities are personal or business, courts look to the purpose behind the insured business owner's activities. *See Rayburn v. MSI Ins. Co.*, 624 N.W.2d 878, 882 (Wis. App. 2000); *Leblanc*, 2013 WL 2149750 at *9 (interpreting the phrase "conduct of a business" and noting the insured business owner's activities were not "performed for the purpose of the business").

---

[11] The undated policy form Denmark relies upon in her opposition contains an almost identical provision defining who is an insured under the policy. (*See* Doc. 29-1 at 82; Doc. 41-7 at 43). Accordingly, Wren must have been acting with respect to the conduct of the business of the Salon at the time of the accident to be an insured under the terms of the undated policy form Denmark relies upon.

At the time of the accident, Wren was en route from her home outside of Cullman to Hartselle, Alabama to meet her sisters for her birthday lunch. (Doc. 29-1 at 147, 149 (33:12-20; 43:7-13)). Therefore, based on Wren's undisputed testimony, her trip to Hartselle served a personal purpose. Wren also testified, however, that she planned to shop for items for the Salon after her birthday lunch and selected Hartselle as a meeting location in part because it was on the way to where she planned to shop for the Salon. (Doc. 41-3 at 5-6 (18:13-20:9; 21:8-16)). Based on this testimony, Denmark asserts Wren was acting with respect to the conduct of her business at the time of the accident because her trip to Hartselle had a dual purpose. (*See* Doc. 41 at 5, 11).

State Farm ignores Wren's contention she selected Hartselle as a meeting location in part because it was en route to her shopping destination for the Salon and also does not address whether an insured's activities that serve both a personal and a business purpose may be considered conduct of a business. Moreover, none of the cases cited in State Farm's motion for summary judgment analyze whether a business owner's activities that serve a dual purpose may be considered conduct of a business. *See Leblanc,* 2013 WL 2149750 at *9 (analyzing whether claims against an insured business owner were related to the conduct of his business and noting that the claims "had nothing to do with [the insured's] conduct of [the business]"); *Anderson*, 2005 WL 3336496 at *4 (concluding there was no

insurance coverage for claims asserted against a business owner in an underlying suit in part because the claims arose from an act that "did not arise from, relate to, or further the conduct of [his] business"); *Rayburn.*, 624 N.W.2d at 882 (holding "a reasonable person would understand that one is not engaged in the conduct of a business when the activity is not performed for the purpose of the business"); *Linehan*, 616 N.W.2d at 921 ("[C]onduct is either personal or business."); *Sentry Ins. Co. v. Sahlberg*, No. CA935331E, 1995 WL 809951, *3 (Mass. Super. March 28, 1995) (holding an insured business owner's volunteer activities unrelated to his business and having only an "accidental nexus" to his business could not be considered "the conduct of a business").

The phrase "conduct of a business" clearly covers a business owner's activities that only serve a business purpose and does not cover activities that are strictly personal.  However, a reasonable jury may also understand the phrase "conduct of a business" to encompass activities that serve both a business and a personal purpose.  As it applies to this matter, therefore, the phrase "conduct of a business" is ambiguous to the extent it relates to a business owner's activities that serve a dual purpose, and this ambiguity must be construed in favor of the insured.

Wren testified she planned to meet her sisters in Hartselle for her birthday lunch in part because it was on the way to Decatur and Huntsville, where she planned to shop for the Salon.  Accordingly, Wren was not only en route to meet

her sisters for lunch at the time of the accident but also was en route to her shopping destination for the Salon.   Construing this evidence in the light most favorable to Denmark, as required at this stage of the case, Wren's trip to Hartselle was related to the business of the Salon and served a business purpose along with a personal purpose.   Therefore, a jury interpreting the terms of the Certified Policy in favor of coverage could reasonably conclude Wren was acting with respect to the conduct of the business at the time of the accident.   As a result, Denmark has introduced enough evidence to show there is a genuine issue of material fact regarding whether Wren is an insured under the Certified Policy.[12]

---

[12] Denmark also argues Wren was acting with respect to her conduct of the business at the time of the accident based on the following evidence:  (1) Wren met with cosmetologists at the Salon to take pictures for the Salon's website on the morning of the accident; (2) Wren had her business credit card in the Lexus with her at the time of the accident; (3) Wren had her taxes in the Lexus to work on "if she had a free minute during the day;" (4) Wren considers herself to always be on the job advertising for the Salon; and (5) Wren claims 100% of the mileage of the Lexus as deductible business miles on her tax return.   (See Doc. 41 at 13).  None of that evidence, however, could lead a jury to reasonably conclude Wren was acting with respect to the conduct of the business at the time of the accident.

First, Wren had indisputably finished the photo shoot at the Salon and gone home before the accident.  Therefore, Wren's testimony regarding the photo shoot could not reasonably lead to a conclusion that she was on the job at the time of the accident.  Next, the other evidence Denmark cited to support her argument Wren was acting with respect to the conduct of the business at the time of the accident has no bearing on the purpose of Wren's activities at the time of the accident.  Rather, each of the other items of evidence is nothing more than an "accidental nexus" between the accident and Wren's business.  An accidental nexus between Wren's business and the accident is not sufficient to support a conclusion that Wren was acting with respect to the conduct of the business at the time of the accident.  See Rayburn, 624 N.W.2d at 882 (finding an insured business owner's use of tools from his business was not determinative of whether he was acting with respect to the conduct of the business at the time of an accident); Sahlberg, 1995 WL 809951 at *3 ("The accidental nexus between [the insured business owner's] use of business materials and this non-business purpose does not render his activity one in the conduct of a business.").

**D.**    <u>The State Farm Policy's Auto Exclusion</u>

Even if the Wren Defendants are insureds under the terms of the policy, State Farm has no duty to defend and indemnify them if an exclusion in the policy precludes coverage for the claims asserted against them in the underlying suit. "The insurer bears the burden of proving the applicability of any policy exclusion." *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001). Additionally, insurance policy exclusions "must be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and must be construed most strongly against the company that drew the policy and issued it." *Nationwide Mut. Ins. Co. v. Thomas*, 103 So. 3d 795, 805 (Ala. 2012) (citation omitted).

State Farm argues the auto exclusion in the Certified Policy precludes coverage for the underlying suit. (Doc. 29 at 24-26). Under the Certified Policy's auto exclusion, business liability coverage "does not apply […] [t]o bodily injury … arising out of the … use … of any … auto … owned or operated by … any insured." (Doc. 29-1 at 55). Here, it is undisputed the claims asserted against the Wren Defendants in the underlying suit arose out of the use of an auto operated by Wren. (*See e.g.*, Doc. 29-1 at 15, 150 (46:5-10)). Thus, the auto exclusion precludes coverage for the underlying suit unless an exception to the exclusion applies.

Denmark asserts the auto exclusion does not apply and the State Farm

insurance policy still provides coverage for her claims against the Wren Defendants because the exclusion has an exception for "bodily injury … arising out of the use of any non-owned auto in your business by any person other than you…." (Doc. 29-1 at 56; *see also* Doc. 41 at 11).  As discussed above, however, the Lexus is not a non-owned auto because the Wren Defendants borrowed the vehicle from Wren's husband.  *See* pp. 12-14, *supra*.  Thus, the exception to the exclusion does not apply, and there is no genuine issue of material fact that the auto exclusion precludes coverage for the claims asserted against the Wren Defendants in the underlying suit.[13]  In addition, even if the Lexus were a non-owned auto, the exception to the auto exclusion would not apply because Wren, an insured under the Certified Policy, was using the Lexus at the time of the accident and the exception only applies to the use of a non-owned auto "by any person other than you…." (Doc. 29-1 at 34, 56 (defining "you" as "the Named Insured … and any other person … qualifying as a Named Insured under this policy")).

Because there is no coverage for the claims asserted against the Wren Defendants, State Farm owes no duty to defend them in the underlying suit.  As a

---

[13] The undated policy form Denmark asserts is the policy in force at the time of the accident also contains an exclusion to coverage for "'bodily injury' … arising out of the … use … of any … 'auto' … owned or operated by or rented or loaned to any insured." (Doc. 41-7 at 38).  This auto exclusion in the undated policy form does not apply to "'[b]odily injury' … arising out of the use of any 'non-owned auto' in your business by any person." (*Id*.).  Because the Lexus is not a non-owned auto as defined by the terms of the undated policy form, this exception to the exclusion does not apply, and the auto exclusion precludes coverage for Denmark's claims against the Wren Defendants.

result, State Farm also has no duty to indemnify the Wren Defendants for the claims Demark asserts against them in the underlying suit. *See Tanner*, 874 So.2d at 1063 (holding the duty to defend is broader than the duty to indemnify). Accordingly, State Farm's motion for summary is due to be granted as to Denmark's personal injury action.[14]

### E.   <u>Denmark's Motion to Compel</u>

Along with opposing State Farm's motion for summary judgment, Denmark asks this court to enter an order compelling State Farm to fully answer Denmark's second request for production of documents. (Doc. 36). Specifically, Denmark seeks documents relating to: (1) State Farm's notice of the claim; (2) "billing submitted to State Farm by [the attorney retained to represent Wren by Wren's auto insurer] for work performed in the Denmark case;" and (3) State Farm's investigation of the claim. (*Id*. at 2-6). None of the documents sought by Denmark are relevant to whether the claims against the Wren Defendants arose from the use of an auto operated by an insured or if the Lexus is a non-owned auto. Therefore, they have no bearing on whether the Certified Policy's auto exclusion applies and would have no impact on the resolution of State Farm's motion for

---

[14] The Rule 56 record establishes the State Farm policy does not provide coverage for the claims asserted against the Wren Defendants in the underlying suit because the policy's auto exclusion precludes coverage. Therefore, the undersigned need not and does not address the parties' arguments regarding if the Wren Defendants breached conditions of the policy by failing to provide State Farm with prompt notice of the claim.

summary judgment.  As a result, Denmark's motion to compel is due to be denied as moot.[15]

## IV. RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS**: (1) State Farm's motion for summary judgment (Doc. 29) be **GRANTED** with respect to Denmark's underlying personal injury action currently pending in state court and **DENIED** as **MOOT** with respect to the underlying wrongful death action that has been settled and dismissed; (2) Denmark's motion to compel (Doc. 36) be **DENIED** as **MOOT**; and (3) this Court issue an Order declaring State Farm has no duty to defend or indemnify the Wren Defendants for the claims asserted against them in Denmark's underlying personal injury action.

## V.  NOTICE OF RIGHT TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), FED. R. CIV. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal, except for

---

[15] A party opposing summary judgment may seek relief under Rule 56(d) of the Federal Rules of Civil Procedure if the party "cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).   Denmark did not submit any Rule 56(d) affidavit or declaration.   Accordingly, Denmark appears to concede that the documents she seeks in her motion to compel are not essential to her opposition to State Farm's motion for summary judgment.

plain error.   Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.   A copy of the objections must be served upon all other parties to the action.

      **DONE** this 8th day of January, 2016.


                                                          _____

                                                          STACI  G. CORNELIUS
                                                          U.S. MAGISTRATE JUDGE